FRANK GRASSO et al., Respondents, v. PAUL PHILLIPS, as President of United Papermakers and Paperworkers, et al., Appellants.

Judgment in favor of plaintiffs affirmed, with costs to respondents.

BERGAN, J. (dissenting). Plaintiffs who are a group of officers and members of the United Papermakers and Paperworkers, an international labor union, have sought and obtained from the New York Supreme Court a judgment passing on a disputed point of interpretation of the union's constitution, with resulting affirmative and injunctive relief.

The intervention by the court in the internal affairs of the union with radical judicial directions undoing the acts of its officers because the plaintiffs demonstrate a difference with the union administration as to policies and acts permitted by the constitution, is not warranted on this record. Plaintiffs, suing for themselves and others said to share their opinions, show no impairment of any property right of their own or of the others said to be similarly situated.

The union was formed in 1957 by a merger of A. F. of L. and C. I. O. unions and on the merger 13 regions were created for administrative purposes, each having a vice-president. There is proof that the establishment of this number of regions was to minimize the dislocations within the constituent unions resulting from the merger and to provide a continuance of officers of both previous separate organizations; and that it would be expected as time went on that the number of regions would be reduced.

The constitution, adopted in 1957 and amended in 1960, provided for "15 International Vice Presidents" and for the election of vice-presidents, known in such case also as "Regional Directors" by the regions "now established". The number of such regions at the times of adoption and amendment of the constitution was 13. The other two vice-presidents were "at large".

The constitution (art. VI, § 1, subd. [a]) vested in the international president powers in respect of revision of the regions. The one significant to this litigation is: "He may establish or revise regional boundaries to advance the efficient operation of the organization." The power of constitutional interpretation is vested in the president: "He shall interpret this Constitution." (Art. VI.) His official acts are made subject to the approval of the executive board (art. VI, § 1, subd. [c]).

This constitutes a clear delegation to the president of an arbitral or judicial power within the union to pass definitively and with authority on issues of meaning and intent of constitutional language when disputes, such as this one is, arise between contending factions.

On February 7, 1961 Donald Thoms, vice-president, regional director, of Region X died. This region embraced the States of Oklahoma, Illinois, Kansas, Missouri, Iowa, Colorado and Nebraska. Thereafter, the international president, defendant Phillips, eliminated Region X and, by adjusting contiguous regional areas, absorbed the territory of Region X into certain other regions. This action was approved by the executive board of the union; and the vacancy in the office of vice-president caused by Mr. Thom's death was filled by the executive board until the next international convention on the theory that although there were then 12 regions the number of vice-presidents continued at 15 and there was a vacancy.

The president has interpreted the constitutional language, "establish or revise regional boundaries" to embrace a power to eliminate a region; and his order in respect of Region X was in pursuance of this interpretation. The court at Special Term has read this language in a narrower sense to exclude any possibility of eliminating a region and has granted judgment accordingly for broad **equitable relief.**

Unless the president's interpretation is altogether arbitrary and unreasonable, it must be sustained; and even if his interpretation goes very far afield from the sense in which a lawyer or judge would read the union charter, the president's interpretation must be followed, absent some clearly demonstrated adverse effect upon a "property right" of the protestants who come to court claiming to be aggrieved.

Nothing is better settled in American decisional law than the refusal of the court in equity to intervene point by point in issues of constitutional interpretation of union charters at the instance of contending groups within the union walls who show no greater a "property" right than the desire for an enlarged influence in the dynamic flow of union affairs.

Equitable intervention in the internal affairs of labor organizations has been justified on the same general grounds that have warranted it in fraternal or other membership groups, i.e., because some "property" right of the complaining member or members has been found adversely affected.

Since the modern labor organization exercises so large an influence on the economic life of its members, and, indeed, often controls their ability to make a living, it has not been difficult to find a property right adversely affected in expulsion proceedings by unions or in the diversion of union funds by officers and committees. But unless some such direct economic right is seen affected in the controversy brought before the court, there remains a marked judicial reluctance to adjudicate internal union disputes.

The general rule is stated in Corpus Juris Secundum (vol. 87, Trade Unions, § 47, p. 854) that "interference by the courts is not warranted unless it clearly appears that there has been an abuse of power above and beyond some internal controversy merely involving a debatable question" (p. 855). "Generally, however, courts should intervene in the internal affairs of unions only in case of grave necessity or where a patent injustice will be redressed" (p. 856).

A good illustration of this rule is in *Harris* v. *Missouri Pac. R. Co.* (1 F. Supp. 946). There a dispute arose between two locals of the Grand International Brotherhood of Locomotive Engineers on the question of seniority rights involved in certain runs on the Missouri Pacific Railroad. A ruling on this controversy was given by the union's international general ·committee of adjustment. The plaintiff contended that this ruling was in direct conflict with a former ruling which had become the established law of the order and that it was in violation of the constitution and by-laws of the order to the detriment of the plaintiff (p. 948).

The court noted: " That the courts will not review the correctness of the interpretations fairly placed upon the constitution and by-laws of a voluntary association by its duly authorized tribunals, particularly where only a procedural or a jurisdictional question is involved, seems to be the settled rule" (p. 950). Incorporated in its opinion (p. 949) is a statement from Oakes, Organized Labor and Industrial Conflicts (§ 91) which seems to have a pointed application to the controversy now before us: "Ordinarily the courts will not interfere with the internal affairs of the union so as to settle disputes between the members, or questions of policy or internal management. They will intervene only when civil or property rights are involved and then only when there has been bad faith or fraud, or a question of public policy is involved, or the constitution or by-laws of the union have been violated by the acts of which complaint is made. They will not overrule the decision of a union tribunal merely because of a difference of opinion as to the merits."

These views are in general harmony with the prevailing law in New York. (*Cohen* v. *Thomas*, 209 N. Y. 407; *Powell* v. *United Assn. of Plumbers & Steam-fitters of U. S. & Canada*, 240 N. Y. 616; *Sherman* v. *Abeles*, 265 N. Y. 383, 392;

*Havens* v. *King,* 221 App. Div. 475; *Dakchoylous* v. *Ernst,* 282 App. Div. 1101; *Dusing* v. *Nuzzo,* 178 Misc. 965.)

It is, of course, logical enough to say, as the court at Special Term did, that a power to "revise regional boundaries" is not a power to eliminate a region. And yet, for a court to be more logical in interpretation of the union constitution than the union officers is not a sufficient warrant for judicial intervention.

A reasonable argument can be made that in the context of this constitution and in the circumstances of its development, the word "revise" be read to include "eliminate". The word "establish", which appears before "or revise", for example, connotes a somewhat broader power than "lay down", which would ordinarily be the sense in which a boundary of a region would be newly promulgated, as distinguished from the creation itself of a new region, which would normally rest on such a word as "establish". A power to "establish" a boundary of an area is very close in meaning to a power to establish the area itself. The appellants in their brief develop a broader acceptable meaning to the word "revise" than the court at Special Term was willing to give it in the constitutional context.

The argument for affirmance by plaintiffs points up the peripheral place of this case in the area of judicial intervention in labor union disputes. Essentially the dispute is seen, even by the plaintiffs, to be one of logic and semantics. For at one point in plaintiffs' brief it is noted with respect to the alterations of the regions by the president, as approved by the executive board: "This was a bold bit of leger-de-main and the most blatant kind of semantic [*sic*] accompanied by a most amazing bold faced contradiction in logic"; and concerning the president's justification of his determinations in his testimony, it is noted that "His vague meandering and self-contradictory responses does [*sic*] not lend any support to even his shaky semantic logic".

It is reasonable to think the draftsmen here had something more in mind than a power, merely, to lay down different lines. This broader scope of power seems implicit, too, from the fact that it seems to have been the intention of the two merging organizations in 1957 to provide ultimately for a simpler organizational structure.

And this seems the sense of the union membership, too. For example, 3 separate resolutions were offered at the 1960 International Convention which would have fixed the number of regions at 13. These resolutions were specifically rejected by a vote of the convention and there is no constitutional or other relevant union regulation requiring there be 13 regions.

It is also argued by plaintiffs that by the process of subtracting the 2 vice-presidents at large from the total of 15 vice-presidents provided in the constitution, there remain 13 vice-presidents and this infers vice-presidents of 13 continuing regions. But the constitution elsewhere provides (art. VI, § 5), in defining duties of vice-presidents, that "They shall serve as Regional Directors where specified or in other departments and programs of the Union."

The reasons given by the president for the elimination of Region X are grounded in economy and in improved administrative practice. This is debated by plaintiffs; but one would scarcely expect judicial intervention to rest in any part on this kind of an issue.

Moreover, the connection of the New York court with this controversy is fairly tenuous. It is true that the main office of the union is in this State, but the region involved, and the union members whose administrative convenience is most directly concerned, are in the Midwest and this should add weight to the normal reluctance of a court of equity to intervene in such a dispute as this.

It may well be, too, that the vice-president having been actually elected by the executive board, the validity of the election with which the court at Special

Term dealt, is a Federal question and that it should at least be determined initially by the United States Secretary of Labor whether the issue is pre-empted under the Landrum-Griffin Act (*Dooley* v. *Anton,* 8 N Y 2d 91). But if it be determined that the New York court in equity ought not to intervene, and grant injunctive and other equitable relief, it would be unnecessary to reach the question of Federal pre-emption; or, indeed, the merits of the validity of the election; for if the region could be eliminated, the election seems authorized.

The judgment should be reversed and the complaint dismissed.

Breitel, J. P., Rabin, McNally and Eager, JJ., concur in decision; Bergan, J., dissents and votes to reverse and dismiss the complaint, in opinion.

Judgment in favor of plaintiffs affirmed, with costs to respondents.